Chief Justice Maeshall
delivered the opinion of the Court.
Although it is not expressly proved that Richardson and Millspaugh knew that the note on which the3r ad~ vanced the money was made and endorsed to them, or bi blank for the mere purpose of raising money for one Pal'bes, and without any consideration or real transaction between them, we are of opinion that the . . c , ..... , . . circumstances ot the case leave little room to doubt that they did know or understand that such was the facts, and that if this were not so, Turpin, through whose agency the transaction was effected, was acting" for them, and perhaps for both parties; and it is certain that he knew that the note was made and offered for the mere purpose of borrowing money,
If money dealers may shield the most oppressive and extortionate exactions under the form of an acquisition by assignments, it can only be upon the ground 0f a rea] purchase made as such in good faith. If it were sufficient for the transaction to bear the form of . , , > ,, . , , , an assignment and purchase, nothing would be easier *13 than for it to be put into that form in all cases in which the needy applicant had a friend willing to assume the attitude of payee and endorser of his note. Nor would it be less easy to evade the statute, if, in order to fix the character of usury upon the transaction, it were necessary to prove that the party advancing the money for an assigned note, was, in so many words, informed of the real object and nature of the transaction. If he may lawfully purchase at any rate of discount however great, he will of course desire that his advances should be in that form; and if he is not to be affected by the presumptions arising from those characteristics which indicate a loan or borrowing to have been the real intent of the transaction, he may avoid actual knowledge by the failure to enquire into what he well understands, or by the interposition of a third person between himself and the borrow'd’.
In this ease it appears that there w-as no direct communication between the parties to the note and Richardson and Millspaugh, who really advanced the money. But George Scobee being in need of money applied to Turpin for a loan, and being told that he had no money to lend, but that if he had a note to sell he cóuld come, a note was afterwards drawn under the direction of Turpin, signed by George Scobee and William Scobee (his surety) and payable to J. Dooley, by whom it was assigned either to Richardson and Millspaugh or in blank. In the mean time Turpin had consulted with Richardson, and after the note was brought to him, signed by George Scobee alone, had required an additional obligor, and being furnished with $430 by Richardson and Millspaugh, handed it to George Scobee and received the note just then executed for $688, payable in twelve months with the agreement, in part, that if George Scobee should make payment at any time after two months, he should be allowed a discount or advance, for the time the note might have to run, at the same rate as that at which the money was advanced on the note, which was five per cent, per month. It is to be assumed that these terms were cither fixed on be *14 tween Turpin and the parties who advanced the money, and who admit that they knew they were not buying from Turpin himself, or else that they authorized Turpin to arrange the terms of the advance. They do not deny the last feature of those terms, as above stated, and it is to be presumed they knew before they parted with their money on what terms it was to be put out of their control. They allege that they purchased the note from Dooley, and on the faith of his endorsement, knowing his solvency and correctness, and that they did not know who were the makers, of whom it appears that although one was embarrassed the other was good. Then waiving the inference that the name of the surety was added to the note at their suggestion, could they reasonably have supposed that Dooly, a solvent pan, was selling this note as his own property at the exorbitant and ruinous discount which was agreed on? Would it not have excited the enquiry from an ordinary man, as to the motive for such a sacrifice? Would not the buyer of a note enquire who were the makers, and what the consideration? Would he not ordinarily like to see the assignor at least, if not the maker, before he invested his money? And, in a country where the office of broker is not common, would he not.ask why the vendor of the note, being at hand, did not act for himself? Besides this, the note was, in fact, executed for the purpose and with the intent of borrowing money upon it, and under the direction of the middleman through whom the money was advanced, before the note was finally executed and assigned, and who paid it over as soon as this was done. And if other circumstances were wanting, the agreement that the money might be re-paid within the year on the same terms on which it was advanced, would fix its character as a loan.
If the parties who advanced the money did not, in fact, know that the note was made for the accommodation of one or more of the parties to it, and as a means of borrowing money, their ignorance was wilful and cannot protect them. The transaction was, in our opinion, a mere device to evade the statute of usury, and was, *15 essentially, a loan of the most usurious and oppressive character. Under this view of the case, the decree is at least as favorable to Richardson as the facts would allow and he has no right to complain.
Apperson for plaintiff; Peters for defendant.
The usurious debt having been paid by the Scobees, Dooly had no possible interest in the case, and was a competent witness. The competency of George Scobee, notwithstanding the release of William to whom he has assigned his claim for the usury, being at least doubtful, in the absence of a release from him to Wm. Scobee, we remark that our conclusion would not be affected by the rejection of his deposition.
Wherefore the decree is affirmed.